Good morning, Your Honors, and may it please the Court. Roth Rajan, appearing on behalf of Appellant Nosa Obayando, I'd like to reserve four minutes for rebuttal. I'll watch my clock. The government tried a different case than it charged. The charged offenses all involved discrete acts, one incident of mail theft, and ATM withdrawals from the same bank account. Yet the government, at trial, sentencing, and now on appeal, has sought to connect Mr. Obayando to a broader mail theft scheme. The resulting errors require a new trial. I'll start with the Rule 404B issue and then proceed to loss and restitution with my remaining time. The district court improperly admitted other act evidence of uncharged mail thefts. Because of the dangers associated with propensity-based reasoning, this court has implemented strict guardrails on the admissibility of other act evidence. Yet the government here broadly proclaimed that Mr. Obayando stole mail on the charge date because he was captured on camera stealing mail on three other occasions. This is the exact reasoning rejected by Rule 404B that does not satisfy its stringent requirements. I want to begin briefly with the inextricably intertwined exception. This exception applies only when the other acts are part of a single criminal episode with the charged conduct. The government has not identified a single element of the charged mail theft that needed proof from the uncharged mail thefts. The inextricably intertwined exception was satisfied in Loftus, the case the government and the district court relied on, because the existence of the scheme was an element of fraud. But the mail theft count did not require proof of any such scheme. The other act evidence is- How about on the theory that we needed this to tell a coherent story? The government was able to tell a coherent story without relying on the Uncharged Act. So, for example, it could have relied just on the testimony of Inspector Hudson about what he saw transpire the day that he observed the charged mail theft. The mail theft count only required proof that Mr. Obayando took mail on the date of the charged theft. So the government's theory was that Mr. Obayando was at the mailbox at discrete times. I thought some of these photographs were more relevant to the other two charges, not necessarily the mail theft charge. And for this reason, so I want to clarify the record here, because I believe the government is mistaken in its answering brief. So the uncharged thefts are not relevant to those counts, because the ATM card, Ms. Erte's ATM card was taken from a different mailbox from which Mr. Obayando had access to. So I want to point the court to three excerpt of Record 345, where Inspector Hudson said that he did not see Mr. Obayando at the Cocco Ridge mailbox, which is where the ATM card was taken from. Instead, Mr. Obayando was only seen at the Splendid Manor mailbox. So the uncharged mail thefts could not be used to provide a coherent story or as part of the same transaction for the other two counts as well. If Your Honors don't have any other questions about the inextricably intertwined exception, I would want to move on to the other Rule 404b2 exception. So I want to take each exception in turn, starting with the ones that the government advances on appeal. So first, intent fails. I think the government's theory violates the general rule with intent. So this court in United States v. Bettencourt said that discrete intent with discrete acts is the more usual case. And the government here has not offered a non-propensity basis for the reason for why these intents from these discrete acts, these discrete mail thefts, would be transferable or would implicate the intent on the date of the charged theft. But second, a more fundamental problem is that the government – But intent is to – again, as to what offense, right? How about to the identity theft and the access device misuse charge? The government didn't really offer a basis outside of the scheme. So in its rebuttal closing argument, the government tried to use the mailbox theft to say it's like, oh, he knew broadly about this broader conduct and all of those stuff. But here, the government never charged – it never provided any substantive connection between the ATM count and Mr. Obeyondo's presence at the Splendid Manor mailbox. Because again, the ATM card came from a different mailbox with which they conceded that they had no evidence connecting him to. So even if it implicated that aspect of the scheme here, it's still not relevant to providing his intent or what he was doing with the ATM. I mean, I guess the question is, are we slicing it a little too thin here? I mean, sometimes with these other acts, we're talking about something that happened months earlier, years earlier, a totally different kind of thing. It starts to raise real questions. Here, you know, what's a little different about this case is that the other acts, as you described them, are sort of – they are similar in time and in nature to some of the charged accounts. I think it's important to slice a little bit with respect to the timeline. So the ATM withdrawals, all the government's evidence was from February or March of 2018, and the uncharged mail thefts occurred months before. So they occurred in July and August. So there we would argue that their connection is much more tenuous than the connection that we have here. But even for the intent, if we narrow it down to the mail theft, the charged mail theft itself where there's a closer temporal connection between the offenses, the uncharged mail thefts, there was minimal proof of what intent was for those offenses. So all the evidence that the government had of the uncharged mail thefts were those photographs at the mailbox. But in order to prove mail theft, you have to establish that the person intended to deprive the owner of the use or benefit of the mail. But with the photographs, they don't show whether Mr. Obiondo took mail belonging to another person. And even if you assume that the mail did – Well, I mean, perhaps not on their own, but they're part of a corpus of evidence, right, where somebody observed him taking mail, personally observed him taking mail from a mailbox, right? I think that confuses a little bit about the inextricably intertwined exception where it talks about, oh, we need to tell a coherent or compelling story about the offense, which here we have demonstrated that that's not necessary because we have discrete acts at issue with the Rule 404b2 evidence, where they need to have sufficient proof of its relevance to the purpose in which the government is using it. So for intent, the government had no evidence just because it just had these photographs which didn't show whose mail was taken, what was done with the mail, all of which are part of the intent required for the mail theft count. I also – I next want to move on briefly to another Rule 404b2 purpose that the government relies on, which is identity. And I think here it's important to understand the particular dates that the government alleged the uncharged mail theft. So for July 2nd and July 8th and August 4th were the dates that the government relied on. But for those first two dates, the pictures are simply too unclear. They were taken late at night, and they're too dark outside to even make out who exactly is implicated. So I think those – both of those pictures are simply out when it comes for identity purposes. I mean, why couldn't the jury agree with you on that? So I will say that the role for the jury with other acts evidence is a little more limited than it is more generally, because the – this Court in United States v. Curtin, the en banc Court, recognized that there's a danger when you introduce other acts of distracting the trier of fact from what actually transpired on the date of the offense. And here that – which is a reason why the district court needs to play more of a gatekeeping role than it might otherwise under other rules of evidence. So here, because the government consistently referenced in its closing argument saying Mr. Obriondo committed these thefts on these other dates, we say here that that sort of implication impermissibly kind of taints the verdict that the jury will have, and the district court needs to exercise its discretion and exclude those sorts of – that sort of evidence. But going back briefly to the pictures, the only picture that is actually clear is from August 4th, and that's after the offense occurred. And even then, there's nothing under this Court's case law that shows something sufficiently distinctive in order to make a connection for identity purposes. So this Court's case law has emphasized that you need unusual characteristics, and the only thing particular here was the mailbox. But the government had introduced evidence that at least two individuals had frequented the mailbox. So that by itself could not establish something that was sufficiently distinctive for identity purposes. But it is quite unique in similar circumstances to have people kind of loitering, hanging around the mailbox. I think here the issue is that Mr. Obriondo's defense was that his co-defendant was the one who committed the mail theft. And all the evidence the government had was that two individuals were at the mailbox, Mr. Obriondo and his co-defendant. So the other acts of evidence did not do anything in terms of identity of narrowing it down when considered in the context of the defense theory. Presumably you were – I don't know if you were trial counsel or not, but you probably made that point to the jury in those pictures. It may not be him. Mr. Obriondo might have been his roommate. I think that's right, and that's an argument that defense counsel can make. But again, I would like to go back to the dangers with other act evidence that this Court emphasized. Because the government repeatedly claimed without – with this evidence that Mr. Obriondo was the one captured stealing mail on these other dates, and had the jury draw the inference that then he must have been the one who committed the mail theft on the date of the charge conduct. Can you address this – the loss issue? Sure. So I'm happy to turn to the loss issue. So I think there are two issues with loss. There's both the substantive issue with the proof that the government supplied with relevance to the evidence. So I want to focus first on Mr. Handy. Here we don't think that the government supplied sufficient evidence as to his loss. Because the only document that the government provided was this anonymized statement. We don't have no idea who it's from, what date it's from. And that even fails the minimal indicia of reliability that this Court has demanded in cases like United States v. Franklin, which you need for sentencing evidence. Before you get into the details, our en banc decision in Lucas, does that – should we now apply preponderance of evidence standards? Preponderance of evidence for any factual findings underpinning the guideline enhancement. But here we have several claimed legal errors, the amount of proof that the government supplied as to the North Carolina transaction. And then the government – and then the district court also never properly defined what exactly was the jointly undertaken criminal activity for purposes of the loss calculation. And that is error here. That's legal error because it's unclear how transactions that occurred in North Carolina with a different ATM card, a different bank, could have possibly implicated the jointly undertaken activity. But didn't – wasn't this – the North Carolina person had their mail sent to these mailboxes? So the only evidence that I could find in the record was there was mail forwarding from the North Carolina – the North Carolina transactions to the – to Las Vegas. But there was – based on my review of the record, there was no evidence that an actual bank card was sent to Las Vegas. In fact, all of the transactions occurred in North Carolina, and the government never offered evidence at sentencing connecting Mr. Obeyando to those transactions there. And this was over $100,000, which drove a lot of the loss amount and loss calculation here. Now, briefly on the other two individuals, the government – the district court was confused as to reimbursement. So then the government and the district court both misidentified the basis for loss. They never expressly claimed that the – just that the banks themselves lost money. Rather, they claimed the individuals lost money. But then the record revealed that these individuals were reimbursed, which means that they cannot qualify for loss enhancement purposes under the guidelines. It's a – I'm not sure if you have any other further questions. I'd like to reserve the rest of my time for everyone. Thank you. Good morning. May it please the Court. Peter Walkingshaw on behalf of the United States. I think I'd like to take the issues presented by the defendant in reverse order with the Court's permission, unless there are any immediate questions. With respect to the loss calculation, I'd like to first note that FAM, the case cited by the defendants in their briefs regarding whether or not an individual is a victim for purposes of loss calculation, has to do with an enhancement that deals with the number of victims. But it really elides or sidesteps the question of – the last question is, was money taken in the event of actual loss, or in the case of attempted loss, was money attempted to be taken? So the question of whether or not the withdrawal was made from North Carolina ultimately redounded to the loss of the banks or individuals is kind of immaterial here. So walk through the evidence that shows that the $100,000-plus is connected to this scheme. Right. So your Honor is correct that Mr. Handy, the victim, who lived in Tennessee but the withdrawals were made in North Carolina, had his mail forwarded to Catcoot Ridge. How do we know that? It was submitted as part of a statement attached to the government's sentencing brief. And I'll note at this point, it was never contested at sentencing, during the sentencing memos, that these individuals did not suffer these losses. The subject of debate at sentencing was whether or not these losses were reasonably foreseeable to Mr. Obeyondo, such that they fit within the definition of something arising from jointly undertaken criminal activity. So his mail was forwarded? To Catcoot Ridge, yes. To one of the two Las Vegas mailboxes that the defendants in this case. Was there a mail forward, you know, sort of designation on his mail account? Or also do we know that physical pieces of mail of his went to Las Vegas? So Mr. Handy submitted a written statement that was attached to the government's sentencing brief, in which he describes that he was repeatedly notified that his mail was forwarded to an address in Las Vegas. And then he was contacted a number of times by Bank of America, saying that someone was trying to open up a new account in his name, in which he said, you know, I don't want to allow this. But nonetheless, one was eventually opened. So the basis for the account of what happened to Mr. Handy is from his statement that was submitted as part of the government's sentencing memorandum. I would just put forward that that statement is inherently reliable. It notes, it tracks the scheme quite carefully. And then it submits several case numbers, both for Bank of America and a police report number. These, Mr. Handy and his wife repeatedly made attempts to thwart the theft of Mr. Handy's identity and unfortunately were ultimately unavailable. But again, this was an item that was not contested at any point during sentencing. Counsel, just to be clear, we're talking about two different things here with loss amount. First of all, the loss calculation and the sentencing enhancements, right? Under 2B1.1. Certainly. And that's the Mr. Handy loss, and your position is that even if the court excludes other losses to other victims, Mr. Handy's loss alone would qualify for that enhancement, correct? That is our position, Your Honor. I believe, and I'm sure defense counsel will correct me if I'm wrong, but Mr. Handy's is really the one that seems to be the most at issue, given that it took place the furthest from Las Vegas. And he had by far the largest loss. His was $100,000 out of $137,000. So essentially, the question for this court is whether or not Mr. Handy's loss is properly attributable to Mr. O'Rourke's conduct. We submit that it is. But that's really, I believe. So if this court accepts that proposition, then we get to the reasonably foreseeable analysis by the district court. And that really bears on the issue of restitution, does it not? Well, it's not part of the restitution test. I think it certainly goes to whether or not it is fair, Your Honor, which is really the sole issue for debate between the parties, given the plain error standard. And as we acknowledge in our brief, the restitution order is legally erroneous. The statute only provides for restitution in cases where the losses are part of a broader scheme. It wasn't objected to below. And so it's our position that it's simply not unfair to require Mr. Obeyando to repay victims from a scheme, even if not formally charged, a scheme that he participated in and that caused these losses. It may be not unfair in a cosmic sense, but I don't know why you wouldn't just agree on this, on the restitution piece of this. Your Honor, to be honest, I feel an incumbent, on my permission to, I feel an incumbent upon my position to advocate for the victims here. And beyond that, I think our briefs speak for themselves. Why weren't... Didn't the sentencing objections cover this? In other words, you say it's plain error, but it was objected to in the pre-sentence report. The pre-sentence report. So as part of the informal pre-sentence report objections, I believe it was, Your Honor, but wasn't raised before the district court. And for the restitution under the MVRA, I think, you know, bulk of it, you know, 90,000 of it came from three other offenses. Why weren't those charged, just out of curiosity? I'm sorry, I don't quite follow. I think the restitution amount under the MVRA, I think, were restitution for people who, for offenses that were not charged, right? Yes. Well, they certainly weren't charges to Mr. Obeyando. Yes, it's uncharged conduct, Your Honor. Yeah, so, I mean, why weren't those charged? I mean, obviously, if they were charged, you get conviction on those, and you can get, you know, there wouldn't be an issue here about restitution. You know, Your Honor, I'm not entirely sure. I believe, you know, that once the scheme was discovered, the government, and I have to step a little bit outside the record here, but the government set forth to identify victims of the scheme. Not all of that happened right away. You know, beyond that, I don't have a lot more insight as to the particulars of the decisions. Unless there are any other questions regarding the sentencing issues, I'd like to move on to the photograph. Well, let's just close out the sentencing issues, so, on the reasonably foreseeable part, I don't know if you fully closed the loop on that. Fair enough, Your Honor. So, if you look at, and I believe this is on page 26 of the record, this is where the crimes arising from, and I'm paraphrasing here slightly, but crimes arising from mail forwarded to Kaku Ridge and Splendid Manor Court were within the scope of the criminal activity that Mr. Obeyato and his co-conspirator engaged in. These victims, the three identified, resulting in the $137,000 beyond Dr. Erte, all had their mail forwarded to Kaku Ridge or Splendid Manor Court. And if you're running an identity theft scheme, it is plainly foreseeable that the people whose mail that you have fraudulently forwarded to obtain their personal information to steal their identity will have their identity stolen. The fact that the withdrawals against their accounts, or the accounts that are fraudulently set up, happen in other states is somewhat immaterial in that the point of the enterprise is to set up fraudulent accounts to steal these people's money. So the idea that it's somehow unforeseeable that Mr. Obeyato, given that he was stealing mail from Splendid Manor Court and using an ATM card that was sent to Kaku Ridge, which was the other mail, unattended mailbox that I believe there was some discussion and opening argument that he was unconnected to, Dr. Erte's card was sent to Kaku Ridge and Mr. Obeyato was subsequently photographed using it at an ATM. It's the government's position that it's simply plainly foreseeable that people who had their mail fraudulently forwarded to these addresses and then had their identity stolen, it would have been foreseeable to someone participating in that scheme that that would occur. And the implication is that Mr. Handy lost his identity due to this scheme? Is the timing? Yes. Yes. Okay. So as noted by the district courts, again, I would refer the court to the discussion on the record on pages 26 and 27. He had his mail forwarded to these addresses roughly during the time in which Mr. Obeyato and Mr. Ariyaworai were engaged in the theft and identity theft schemes. How do we find on this record that the court adequately addressed all of the factors that the district court did explicitly discuss the fact that there were three factors if it listened at length to argument from the parties regarding those factors? I mean, really, the finding that's necessary here for the court to make is that the loss was within the scope of jointly undertaken criminal activity. Did the court make that finding? It did, Your Honor. Again, I would refer the court to pages 26 and 27 of the record. I believe the defense is effectively saying that there needs to be a bit of a magic words test for the three factors here, and I just don't see any support for that in the case law. I think it's rather— But I read the transcript. The court said, looking at 1B1.3, the only thing I have trouble with is the reasonable  Is the third factor, I believe. It's hard for— The court never articulated the factors and said, I find this is jointly undertaken criminal activity. I believe a slightly earlier in the transcript—well, I have to look at it again, Your Honor. But I believe it's—I believe it's plain from the record that the court is looking at the three factors, that what the parties were discussing, it discusses—the court mentioned that there are three factors, and it's really the only third one that requires lengthy explanation. So I think it's readily inferable from the record here what the court was doing. It's not like other cases where there's simply no basis for this court to understand how the court came to its conclusion. I think the court's explanation is on page 26, and I think it's—it's plainly clear as to what it was doing there. I'd like to—unless there are any other questions, I'd move on to the 404B issue. So the fact that Mr. Obeyando was participating in a male theft and identity theft scheme and that the government charged discrete acts within that scheme does not mean that the jury cannot hear about the broader scheme in which Mr. Obeyando was engaged. The jury is entitled to hear the context in which the charged offenses took place. And here it was necessary for the—for the jurors to hear about—about the extent to which Mr. Obeyando was stealing from the Splendid Manor Court mailbox because it answers the question of how was he able to get an access identity card like the fraudulently issued ATM card under Dr. Erte's name. It also answers the question of, well, is he—did he know whether or not he had permission to use this card or not? Well, obviously didn't because he was participating in a scheme to steal people's mail, obtain their personal identifying information, and thereby open up accounts in their name so that he could defraud them. Now, there's a—there's a repeated suggestion by the defense that somehow the references to other mail thefts is either—is prejudicial, and in some respects it is prejudicial because all the government's evidence in criminal cases is prejudicial. It tends to prove that a defendant is involved in a—in a criminal act, but the question is, is the prejudice unfair? So is it inviting the jury to make a decision based on emotions or something that's plainly here? The context matters. In order for the jury to understand, well, how did he get this ATM card, it needed to understand that he was involved in an ongoing mail theft scheme. And— Wasn't there—I mean, the photographs were supportive of that, but there was other evidence of that also. That's true, Your Honor, and I think there's really no reason why both those things weren't valid. Well, but it just kind of goes to your point as to whether this was necessary from the someone could respond saying that there was other evidence of context here. We didn't need these dark photographs. Well, Your Honor, I think it—perhaps to some—he said that there was other evidence that perhaps—that really bears on the probative value in the 403 Wang analysis, but I remind the Court that the—the defendant continues to vociferously contest his identity as part of the mail theft scheme. No, that's why it seems like a lot of your arguments are really more about whether 404B was met as opposed to whether we're just outside that rule. It certainly may be an easier way for the Court to resolve this case, Your Honor, to determine that it was properly admissible under 404B to prove Mr. Robaillando's identity in that while we'd certainly—and again, we've taken the position that ultimately this evidence is harmless regardless of any error alleged because of the positive identification that Inspector Hudson made, but we do think it is—it is strong evidence of—it corroborates the identification that Inspector Hudson made over the course—over the lengthy course of an evening in which he followed Mr. Robaillando from Slant and Mentor Court to the park where he discarded the stolen mail to the registered address on his driver's license while observing the—the car as he fled. And so I certainly would not disagree with the Court that it is—it is, I think, quite clear that this evidence—if 404B does apply, that this evidence was admissible under 404B both to establish Mr. Robaillando's identity as the mail thief, but also to establish his intent with respect to the access device fraud charge. And I've got about 40 seconds. I'd like to briefly address McCollum. The defense says that this Court's case in McCollum says that if identity is contested, no other acts can come in. That's plainly not what McCollum says. What McCollum says is when identity is the thing that the parties are really contesting, you can't bring in prior convictions or prior bad acts to prove intent because that effectively puts the cart before the horse. If what the defendant is saying is, I didn't do this thing, then it's probably prejudicial for the government to say, well, we know you intended to do the thing that you didn't do because you've done it in the past. But it's when the thing that is actually being contested is intent, which is true for the access device identity theft charge, the aggravated identity theft charge, then it is proper to bring in prior acts for intent. And we know that it doesn't preclude the government from introducing other acts to prove identity because that's the whole point of the Quinn test, is does it guarantee a reasonable likelihood that these two people did the same crime because they're sufficiently distinctive? And in this case, going into an otherwise unoccupied mailbox in a neighborhood full of vacant locks and houses under construction is plainly sufficiently distinctive to establish identity here. I apologize. I see that I'm over time. I'd be happy to answer other questions, but otherwise with that, we will submit. Thank you. Thank you for your time. I want to focus on the loss issue with my rebuttal time. So first, plain error review does not apply below. Ms. Robiondo consistently argued that the government had not proven loss amount. And under this court's cases, like United States v. Kiriluk, all that's required is preserving a claim, not particular arguments under that claim. With respect to the proof for the North Carolina fraud, I think there's some interconnection both between the district court's misarticulation of the three-factor test and the proof that the government offered here. So the only evidence that the government offered was a written statement. Now, the government, my friend on the other side claimed that it's a statement by Mr. Handy, but that is not at all even true based on the record. So if you look at 2ER107, the statement is not even signed by anyone and, in fact, refers to Mr. Handy. Did you challenge this below, though, to point out, to make these arguments to the district court? We challenged the way that the government proved loss. So we focused on the argument about how the district court did not, or how the government did not show it would met the three-factor test, but we believe that that's all that's required under this court's case law in order to preserve the argument about the government's sufficiency of proof. Well, but now we're talking about, you know, something that's more granular, saying, well, you know, this particular statement at 2ER107, that's not sufficient because we don't know, you know, whatever your arguments are going to be on that, I don't think any of that was put before the district court. I don't think so because I think these issues are interconnected with one another. To show that something is within the jointly undertaken criminal activity, you have to show that the government has supplied evidence connecting to it. So the arguments below focused on the way that these actions occurred all the way in North Carolina, yet the government never showed that it actually related to or connected with the claims about how this loss related to a scheme that is outside, or related to actions in Nevada. So we think the connection between those arguments, at least under this court's case law, is in order to preserve the argument. But are you disputing that his mail was set to be forwarded to Las Vegas? The evidence in the record is that his mail was set to be forwarded, but the all the relevant actions took place outside of the State. So there's not even a clear connection between the mail forwarding and what actually happened or what transpired for Mr. Handy to have actually lost money here. And that's not articulated in the statement submitted by this anonymous individual to the sentencing court. And it's not at all clear that it occurred through ATM withdrawals, because if you look at the statement itself, it says $100,000 was transferred from the savings account, and it's not clear to me that you can even withdraw or take that much money from an ATM in order for this person. So there's no corroborating information about how the money was lost, how it relates to Vegas. And these were the thrust of the arguments that we made below in relation to the jointly undertaken activity. And we think that this, because this sort of evidence drove— I don't know if it's the thrust of the argument. You know, I mean, it seems to me you were arguing this person had lost money in North Carolina. Here we are, and we don't know how that credit card or debit card or whatever bank information got out there. I mean, that seemed to be more the tenor of the arguments we saw below. And I think that's just a variation of the argument that I'm making here. So the sufficiency or the inadequacy of the government's proof bears on the connection that it has to Las Vegas.  attributable actual loss to the defendant. And because the government never supplied the specific proof establishing that sort of connection, that's the sort of interrelation between the argument we made below and the one we made here. But I think even then, the district court's failure, as you pointed out, Judge Cain, to even say the first two factors when it comes to the loss amount test, that is sufficient on its basis alone to remand for recalculation or reconsideration of the loss amount issue. And if the panel has no further questions, we ask this Court to reverse and remand. Great. Thank you both for the helpful argument. The case has been submitted, and we are adjourned.
judges: LEE, BRESS, Kane